meeting on holdings, no TV at all. All right. Good morning, Mr. Rodofsky. You reserve two minutes for rebuttal, and you can begin whenever you're ready. Thank you, Your Honors. Good morning. May it please the Court. My name is Edward S. Rodofsky, and I represent Petitioner Ben Turin. Your Honors, this appeal presents two issues. One of them, which, with your permission, I will address momentarily, is a normative Sarbanes-Oxley whistleblower issue. That is, whether the record sufficiently established that Petitioner had a subjective and objectively reasonable belief that his employer was engaging in prohibited conduct, entitling him to protection as a whistleblower. However, the other issue is novel and should be outcome determinative on this appeal. That is, whether there was a fundamental error in the Administrative Review Board affirming the administrative law judge's 2021 ruling that her 2016 order, which we refer to in the briefs as the Maiden order, holding that Petitioner had made out a prima facie case and was credible, was in her holding in 2021, was that— It was only after that determination that that was before Maiden had presented its case. That's true, Your Honor. So there were 23 additional days of testimony, nine additional witnesses. So doesn't that happen all the time where a court makes some preliminary rulings at a certain stage of the case, but then based upon additional testimony and evidence comes out with a different determination? I don't think—well, to begin with, she made findings. She didn't say, I can't make findings. We have to hear the rest of the evidence. After she had heard substantially all of the Petitioner's testimony on his direct case and cross-examination, she made findings. Now— Well, wouldn't that have been error to do so? Excuse me? I mean, wouldn't that have been error had she made definitive—  Hang on. To make definitive findings that a witness is telling the truth before hearing the other side's evidence? I mean, that seems to me that that would be a denial of due process to the other side. First of all— I'm trying to talk. I'm sorry, Your Honor. Wouldn't it be a denial of due process to one side to credit one side's arguments and find that they're telling the truth before even hearing the other side's evidence? No. No, Your Honor, I don't believe it would. First of all, there was no claim raised by the Respondents or the Intervenors now in this Court, in this case, that in any way that their rights were denied, nor did they seek any relief from that. Well, right, because the ALJ in the end credited their witnesses. However— So why would they— She has to— Why would they complain that their rights have been violated? Well, they didn't complain at the time. We tried to appeal to the ARB and take an interlocutory appeal, which was declined by the ARB on the ground that we could raise our arguments at this stage, after the final decision. But I think the underlying answer to Your Honor's question is that the law permits the trial judge to go back and amend the Rule 52 findings, but the trial judge, in this case the ALJ, has to explain why she is doing that. The case law is the Rule 52 findings can be amended if the judge explains why there was manifest error in those findings. There were pages and pages of explanations of why, after hearing all the testimony, she found your client not credible. She referred to CEO Rousbaum's testimony, that your client never raised any concerns about Ziskin's conduct. She credited Mr. Metz's testimony, that your client didn't raise any concerns. So, I mean, I can go through it with all of you. There were pages and pages of explanations of why, after hearing all the evidence, she credited the baseless witnesses over your client. Number one, Your Honor, she says her ruling was a nullity. There's no such thing. A trial judge cannot declare a Rule 52 ruling a nullity, certainly not in the circumstances of this case. If she wanted to go back and amend those findings, she had to explain why they were manifestly wrong. Not wrong, not that she had second thoughts, not that there was subsequent testimony that perhaps led her to change her thinking. She has to conclude that they were manifestly wrong. That's the case law. She didn't. She didn't explain them at all, except inferentially, as Your Honor is suggesting. You don't think a nullity declaring them a nullity means they were manifestly wrong? No, Your Honor. I don't think so. I think that's a term of art, and she didn't explain it. The Respondents didn't argue that. What does the term of art mean? You said nullity is a term of art. What does that mean, then, in your view? In my view, she would have to explain that there had been some error that had infected the prior ruling so that it was no longer a bona fide ruling, and she didn't have to deal with it. She didn't have to deal with it. She was so wildly wrong because your client was a liar and all the other people were telling the truth, and she concluded that firmly. Would that be enough to declare a nullity in your view, that it was, in your words, infected with error? If she carefully reasoned to that conclusion, I think she could. But she didn't. Can I ask you a conceptual question about your case? If we were to disagree with you on this point, and if we were to agree that we had to find that there was substantial evidence upholding and uphold the adverse credibility finding against your client, can you still win? Yes. How? We can win on the second point, which is that the Mr. Tern's state of mind was such that he subjectively, in good faith, as a subjective test, believed that there were violations or attempted violations of the securities law and the fraud laws and the corporate governance standards, and that that belief on his part was objectively reasonable. But let's go back to the subjective prompt. Right. Again, I want to operate hypothetically on the conclusion that your client was not credible, okay, hypothetically on the ground that he was not telling the truth. How do you then get from the record a conclusion that he subjectively believed the things that you say he did when the ALJ found him not credible, that he did not believe it? So, again, hypothetically take, for the sake of argument, the adverse credibility finding. What in the record shows that notwithstanding the fact that he lied during his testimony that he nevertheless had that subjective belief? I think that the documentary evidence of the discussions, the testimony of the outside former outside counsel, that the petitioner had consulted him, and the outside counsel thought his claims were reasonable, objectively reasonable to the outside counsel. But the fact that he had complained, the fact that the record shows that he made complaints all support the notion that he had. Other than your client's testimony that he raised these concerns. It would be the documentary? What's the documentation? There was one e-mail that the ALJ discounted because it was very general. Said something like, I hope this deal doesn't go through. There's documentation of his e-mails with Mr. Rashbaum concerning what exactly was said on the investor call and how it was misleading, inaccurate and misleading. There's documentation of his complaints or claims. That was afterwards, though, that e-mail. When was that e-mail that you were talking about to the CEO? No, that was in the lead up to December 15th. I don't remember the exact date, but that was in the period in the weeks before December 15th. All right. All right. I'll ask him about that. All right. Thank you, Mr. Radofsky. You have two minutes reserved for rebuttal. Thank you. From the Department of Labor, Ms. Ahmed. Thank you. Ms. Ahmed, you can also lower the podium if you'd like. There's a button on the right. Good morning. May it please the Court. My name is Priya Mohamed, and I represent the appellee, the U.S. Department of Labor. The issue before the Court is whether, after 38 days of hearings involving 11 witnesses and hundreds of exhibits, there was substantial evidence supporting the agency's decision that Turin did not subjectively believe that Maiden was committing fraud and that belief was not objectively reasonable. Substantial evidence is a deferential standard of review. It's less than a preponderance but more than a mere scintilla. This Court should affirm the agency's decision. Substantial evidence supports the ALJ's holding that Turin failed to show he subjectively believed that Maiden was violating any of the SOX enumerated provisions. And the ALJ's decision was largely based on the finding that Turin was not credible in all of the instances that he alleged he blew the whistle. Could you address just one question for you? I was unclear whether the ARB had taken a position on whether Mr. Turin reported fraud in a way that was cognizable or necessary, actually, for a SOX violation. Could you address that, please? Yes, Your Honor. The agency found that even though he might have had some concerns, they were not they were too vague to be tethered to a SOX-related provision. And his concerns were it just wasn't clear that he was complaining about, you know, shareholder fraud or — Well, the — your opponent focuses on the reference in the ARB decision to the concerns that he complained of as establishing that he did actually make complaints that were necessary under SOX. Is that how you read the ARB decision as well? No, Your Honor. The ALJ repeatedly put quotes around the term concerns. And this Court has held in Nielsen v. Acom that a complainant must do more than just, you know, articulate some concerns. They have to be tethered to one of the six enumerated SOX provisions. And the ALJ found that Turin did not do that, both based on the subjective belief prong and the objectively reasonable prong. And her subjective belief finding was largely based on her credibility finding, whereas her objectively reasonable — But I'm focusing on the ARB decision, not what the ALJ said, because the ARB wrote that Turin did not have a subjective good-faith belief that the conduct he complained of constituted a violation of SOX. It wasn't clear to me that there was a complaint that was of the type that SOX requires in order to be a protected whistleblower. Yes, Your Honor. The ARB did not find that Turin made a complaint. I suppose it's a little confusing because, colloquially, he is — Turin is arguing he raised some concerns about, you know, Maiden's independent representation. But the agency didn't see that as a sort of complaint, as a more formal complaint. But in any event, its decision focused more on both the subjective and objective prongs. Yes, Your Honor. Mr. Radofsky suggested that the credibility finding, adverse credibility finding and finding that he had no subjective belief was undermined by certain documentation. And you heard a reference in e-mail when I asked him, do you want to address that e-mail? Yes, Your Honor. I'm not sure which e-mail that appellant is referring to. However, in terms of Turin's testimony about Mr. Rochbaum, Mr. Rochbaum himself stated that when they were discussing, you know, Maiden's lack of independent representation, he reassured Turin that he would represent Maiden. And I think in that conversation and as he testified before the ALJ, he didn't see Turin's words as representing some sort of concern about fraud. Moreover, the ALJ considered all of this evidence with numerous citations to the record, all of the e-mails, all of the conversations. And even if Turin reads the facts differently, substantial evidence still supports her reading because it is rooted in the record. Lastly, the substantial evidence also supports the agency's holding that Turin's alleged belief that Maiden was violating a SOX enumerated provision was not objectively reasonable. The ALJ correctly determined that based on Turin's education and experience as a corporate lawyer, he could not have reasonably believed that Ziskin was committing fraud. He knew that the Audit Committee existed to clear related party transactions, and he even drafted that policy as shown in Joint Appendix, page 290. I see that my time is up. May I briefly conclude? Thank you. All right. We'll hear from the intervenors, and I see they've divided the time up. Mr. Weber, you're going first, and you have three minutes. Thank you, Your Honor. Michael Weber, and I'm a diamond for the intervenors except for Barry Ziskin, an intervenor who was represented by my co-counsel, David Sharp. Mr. Turin's arguments boil down to two buckets. One, after, as counsel said, 38 days of hearing, 600 and, excuse me, 400 documents and 6,100 pages of transcript and a 130-page order and decision, somehow she got it wrong. In fact, we think the decision is extremely well-reasoned, and particularly the eight pages she spends talking about credibility findings. She really spent the majority of those eight pages on addressing Mr. Turin's credibility, which she found not to be credible. And it's key because on the standards that we're talking about, she found that neither objectively or subjectively, he had any reason to be concerned about what was transpiring at this time in funding the Maiden Ray, excuse me, the GMAC transaction. The court is, and she is entitled to great deference in her determination, particularly credibility. The second point that Mr. Turin makes is on the rule, 52C ruling. We think, again, the ALJ was correct in giving us an opportunity to present 11 witnesses, 23 more days of hearing, and more importantly, four days of rebuttal testimony by Mr. Turin on our case-in-chief. Those were crucial days where she, again, had an opportunity to see him and view his credibility and make the determination that he was, in fact, not being truthful in this case. She heard 11 witnesses from the interveners, then respondents from the CEO to the President and to all the key players in the transaction dealing with the GMAC acquisition. And, again, she didn't believe that Turin, in his own mind, believed that he was blowing the whistle on anyone. Am I correct in understanding the record that during the period from November 14th through the 28th, when he allegedly was also blowing the whistle, he was buying stock in the company? He was. At the same time during this time period, in the fall of 2008, he was buying 14,000 shares of Maiden because he thought it was a good investment, he thought it was a solid company, and he certainly didn't think there was fraud going on or he wouldn't be buying those shares. How much was that worth at the time, if you know, roughly? No, that's fine. Don't worry about it. It was a five-figure number. I'm not sure what it was. Okay. Any further questions? No, I don't think so. Thank you. Thank you. Okay. We have Mr. Scharf. Good morning, Your Honors. Y. David Scharf of Morrison Cone. We represent Barry Ziskind, but we also represented below Amtrust and AIIM. And there's a passing reference in the Petitioner's brief at page 7 about this Court perhaps ordering further briefing if the Court was interested to address the dismissal of our clients below. I actually don't have anything to add unless the Court has any particular questions for me relating to Mr. Ziskind or Amtrust or AIIM. We rest on the joint submission. Okay. Thank you. Thank you, Your Honor. Okay. Mr. Radofsky, you have two minutes in rebuttal. Thank you, Your Honors. You've got to stay for the rebuttal. Thank you. Your Honor, Mr. Turin, as any whistleblower, certainly a high-level whistleblower, was in a difficult position. He had his obligations to the company. He wanted to continue to work for the company. He believed in the company, as has been established. At the same time, he was concerned with corporate governance issues. He was concerned with, as is made clear by the record, the absolute refusal to let Maiden have an independent representative at the table to negotiate the refinancing, which he clearly thought was a violation of the related party transaction rules. And ultimately, because of the way the refinancing was structured, was a fraud or a potential fraud on the shareholders who were not permitted to benefit by that arrangement. Only the Carfuncles and Mr. Ziskin and several of the Carfuncles' chosen co-shareholders were permitted to participate and profited to the tune of several hundred millions of dollars by this, rather than permitting all of the shareholders to participate. We urge, for the reasons we set forth in the brief, that he was not required, no whistleblower would be, in those circumstances or any circumstances, would be required to label that as fraud or mail fraud or wire fraud or put a particular label on it. It was sufficient that he believed there was corporate wrongdoing of that type, and he brought it to the attention. But it was a finding that he didn't believe it. It's not just the label. There was a finding by ALJ hearing that he didn't believe it. And we urge, for the reasons we've set forth in the brief, and I think all of us here understand the record is voluminous, so to cite chapter and verse, we could be here all day, not just in 10 minutes to do it. In the history of the circuit, when have we ever where a judge, an ALJ administrative judge or a district judge, had a hearing and made a credibility finding that they didn't believe the witness had a subjective belief of X, Y, or Z, that we've overturned that? I don't. I'm not, as I stand here, I'm not familiar with any case in which this has happened, which is why I said this is unprecedented. I don't think there's a case where a district judge or an ALJ has written a formal opinion, a serious opinion, as the judge did here, many, many pages of equally of specific analysis in 2016 and said Mr. Turin, in his direct testimony, which went on for, I think, 16 days was mentioned, days and days and days of direct and cross-examination, was substantially all of his testimony, and said he was consistent and credible, and then turned around and did a, I don't mean any disrespect, did a flip-flop, and brushed it aside and called it a nullity. All right. We understand that. Thank you. Thank you very much. Thank you, Your Honors. Have a good day.